[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] Memorandum of Decision On Motion to Open and Modify Disposition Dated September 14, 2001
The Department of Children and Families (DCF), by its motion which is the subject of this memorandum, seeks modify a disposition of protective supervision entered after an adjudication of neglect on May 17, 2000, and seeks a commitment of both children to the care and custody of DCF. Based upon the following facts found proven by a fair preponderance of the evidence, the Court finds that there is cause for commitment, that commitment of the children to DCF is in their best interest, and by this CT Page 1050 decision Andrew W, Jr and Jonathan W are committed to the Department of Children and Families for a period not to exceed twelve (12) months.
Andrew is four years old and Jonathan is two. Andrew is delayed in all developmental areas; physically, cognitively, speech and language delayed, fine and gross motor skills and visually impaired. Jonathan is also significantly delayed in all areas of development. State's exhibitsC, D and G. Jennifer H (mother) is clinically depressed. State's exhibitG. Although there is some evidence to the contrary, especially as it relates to Andrew, Jr., both children are bonded to mother and father. "There is a clear, bonded and warm relationship between each of the children and each parent." Dr. Logan Green's report, State's ex G., page14. Dr. Green evaluated the family, both individually and for parent/child interaction, on August 15, 2000. At that time DCF had already sought and obtained an adjudication of neglect and an order of protective supervision. Not available to Dr. Green were the reports of Trudy Wilson, M. S., Intensive Family Preservation Clinician, the letter undated but clearly prepared after October 2, 2000 and the termination report of September 8, 2000, collectively State's exhibit C. Also not available to Dr. Green were Wayne Trombly's United Services report of October 16, 2000, State's exhibit K, and Jerry White's Early Connections report of October 6, 2000, State's exhibit D. These subsequent reports appear to render prophetic the findings of Dr. Green in August. Dr. Green might be described as guardedly optimistic about the possibility of progress and success by these parents in learning to parent their children. He notes the following:
 "Ms. H is currently being treated for Major Depressive Disorder. Both parents are at-risk for persecutory thinking and Paranoid Personality Disorder patterns. Ms. H has particularly important withdrawal and avoidance tendencies and a persistent mistrust of others. In helping her, clear signs of warmth and understanding may be needed to insure that treatment is not terminated by Ms. H before substantial improvement has occurred. She has poor self-esteem but does have an adaptive capacity to establish supportive relationships with other people. This is an important element in parenting. Unfortunately, she also appeared to have fewer resources available than most people for coping with the ordinary ideational and emotional demands of everyday living. When confronted with stress she might become avoidant or engage in poor impulse control.
". . . Both parents have certain psychological blocks CT Page 1051 that hinder their understanding of the effects of their own behavior on their children. On the other hand, these are not the sort of blocks that would prevent them from learning and adapting to new skills in raising their children.
 ". . . The intellectual and emotional impairments from which the biological parents suffer are remediable. While both parents appear to have limited intellectual potential and each parent has paranoid personality characteristics, each of them is sincerely interested in the welfare of his and her children. Through appropriate teaching techniques and faithful attendance on their part, the characteristics which impede their childcare developmental understandings can be remedied." State's exhibit G.
Dr. Green recognized the amount of work that needed to be done by these parents, the knowledge needed to be acquired and the services that needed to be in place for them to succeed. He noted that an impediment to success would be lack of motivation.
Subsequent to Dr. Green's evaluation it became evident that the requirements/safeguards required by Dr. Green had not occurred. After his report was written mother treated with her therapist, Wayne Trombley only once before October 16, 2000. State's exhibit K. On or about October 6, 2000, mother reported to Early Connections Developmental Therapist Germ White that Jonathan had no developmental delays and consequently "[T]here has been little follow through on any suggestions made to family" State'sexhibit D. This therapist found filth in the house, especially in the children's bedroom "where they are primarily gated in." This process of restricting the children for substantial periods of time each day in their bedroom would certainly be an environmental contributor to their delayed development. It appears that this method of dealing with the children was not known by Dr. Green, but is clearly consistent with his analysis of both parents' propensity to handle stress by avoidance. The practice of gating persisted after his evaluation. The problem of the filth, especially on the floor, was exacerbated by Jonathan's normal habit of placing everything in his mouth and mother's inability even to notice that he was doing it, much less correct it.
Every witness except mother testified to her relentless use of vile and profane epithets, especially against Andrew, Jr. This source of several citizen referrals to DCF persisted unabated at least until the time of trial on this motion. Mother seems absolutely incapable of correcting this egregious habit and does not understand the devastating effect it CT Page 1052 has on the children, especially Andrew. In fact, she denies it even happens. Additionally, when prompted by DCF, mother filed a sworn affidavit in the Superior Court seeking a temporary restraining order against Andrew W Sr. (father) on September 21, 2000 wherein she confirmed that father was repeatedly threatening to do bodily harm to mother, then two months pregnant by another man, "dealing drugs" and smoking them, all in the presence of the children. She also stated that father hit Andrew on the head with his fist, a fact confirmed by a state's witness on trial.
Intensive Family Preservation (IFP) was commenced for this family on June 28, 2000 as part of the order of protective supervision now sought to be modified to commitment. The history of the case as reported in IFP's termination report (State's exhibit C) of September 8, 2000, is germane to the action the Court is taking upon this motion.
 "The family has had a lengthy history of involvement with the Department of Children and Families. Ms. H and Mr. W have exposed their children to domestic violence, substance and verbal abuse, which have been negatively impacting both children. Their current case was opened due to neglect of the children which had been substantiated in July of 1999. Throughout this past year, DCF continued to receive numerous referrals on the continuous "yelling and screaming' at the children by Ms. H It was determined by DCF that Ms. H was not able to appropriately take care of the children and thus Mr. W agreed to a service agreement devised by DCF that named him as being responsible as the primary care taker of the children. In this agreement, Ms. H was allowed only supervised visits with her children. The day in which IFP services started, another referral had been received however this was on Mr. W indicating he too had been engaging in this same negative behavior.
 "Family Preservation Services were requested by DCF for the H/W Family in order to attempt to avoid an out of home placement of the children." State's exhibit C.
IFP proposed specific items which were clearly on target to accomplish the desired end of preserving the children in the home. The result was fair to poor after eleven weeks and very specific and detailed requirements were set down upon their departure to assure that the parents would continue to learn!improve the much-needed skills necessary CT Page 1053 to keep the children at home. This was on September 8, 2000. On September 26, 2000, DCF asked IFP to return to the home. Because the previously required measures were not being accomplished, it was determined by IFP to remain involved only on a week to week basis, continually assessing the level of risk and safety of the children. During this process, IFP developed "tremendous concern regarding the care and welfare of the two minor children in the home." After outlining all the concerns, IFP concluded as follows:
 "It is the opinion of the Intensive Family Preservation Program that at this time the intervention and the appropriate care and safety needed for the children is not present, thus placing them at a heightened risk for harm." State's exhibit C.
The premise upon which Dr. Green recommended that the children remain in the home under protective supervision was the incorporation of various learned skills and techniques gained by the parents from the service providers into the everyday parenting of the children. Unfortunately, Dr. Green (lid not have the advantage of subsequent information, which would have revealed to him that the parents had failed in virtually every department to accomplish the minimum required for effective parenting of the children Dr Green noted on page 15 of his report, "[A]ccording to the Court documents, Ms. H has been making progress with the parent aide services. The children are clearly involved intimately with bout parents. Therefore, the children should remain with their biological mother." This Court has heard sufficient evidence that there is, in fact, significant regression, especially by mother, thereby placing the children "at a heightened risk of harm."
The Court is sensitive to the fact that there is a bond between these children and their parents, and that removal is an extreme measure which will have an emotional effect on the children. However, considering the ongoing deterioration presently occurring because of mother's failure to follow very specific and detailed items of behavior while parenting, the safety and wellbeing of the children are clearly at risk. It was apparent at trial that father was not at this time a viable resourse for placement of the children.
While the Court has great concern about mother's ability to accomplish all that is necessary within a time period adequate to provide permanency for the children, it is still appropriate for DCF to continue to make reasonable efforts to reunify the children with mother.
This order is effective upon DCF acquiring the children, which is to be CT Page 1054 done forthwith.
By the Court,
Mack, J.